ROBERT AMORY & others, trustees, *vs.* COMMONWEALTH.

Hampden.    January 9, 1947. — April 9, 1947.

Present: FIELD, C.J., RONAN, WILKINS, & SPALDING, JJ.

*Damages,* For property taken or damaged under statutory authority. *Eminent Domain,* Damages.    *Water.    River.    Metropolitan District Water Supply Commission.    Evidence,* Relevancy and materiality, Diversion of water, Of value, Public document, Competency, Paper produced on demand.    *Value.    Witness,* Expert.

At the trial of a petition under St. 1927, c. 321, § 4; G. L. (Ter. Ed.) c. 79, § 14, for assessment of damages sustained by the owner of property on the Chicopee River due to the taking and diversion by the Commonwealth of waters of the Swift River in connection with the construction and maintenance of the Quabbin Reservoir, the Commonwealth was entitled to lessen the amount of damages by reason of a benefit to the petitioner's property resulting from the construction and maintenance of the reservoir only if such benefit was peculiar and direct and resulted in an actual increase in the market value of the property capable of being presently estimated with a reasonable degree of certainty; and, where it appeared that the petitioner's property was adequately protected against ordinary floods which might be expected to occur, it was error to admit evidence of damage caused to the property by the extraordinary floods, unlikely to occur again, accompanying the hurricane of 1938, upon the theory that the construction and operation of the reservoir would either reduce or eliminate any future damage to the property through floods.

The restrictions imposed by the Federal Secretary of War relative to the diversion of waters of the Swift River, which joins and flows into the Chicopee River and thence into the Connecticut River, a navigable stream over which the Federal government has plenary control, were incorporated in and limited the extent of a taking by the Commonwealth of waters of the Swift River under St. 1927, c. 321, in connection with the construction and maintenance of the Quabbin Reservoir, and evidence of the nature and effect of the restrictions on the flow of water in the Swift River properly was admitted at the trial of a petition by a riparian owner on the Chicopee River for assessment of damages resulting from the taking.

In the assessment of damages for the taking of waters from the Swift River under St. 1927, c. 321, it would be immaterial that restrictions imposed by the Federal Secretary of War, incorporated in and limiting the extent of the taking, had not been enforced: nonenforcement would not destroy their validity nor prove their abandonment.

Compensation to which a riparian owner on the Chicopee River was entitled by reason of a taking of waters of the Swift River under St. 1927, c. 321, in conformity with and subject to restrictions imposed by the Federal War Department incorporated in the order of taking should be assessed on the basis of a diversion of water to the full extent permitted by the order as of its date; if the restrictions were subsequently made more onerous, thus benefiting the riparian owner, his compensation would not be diminished thereby, and if subsequently the restrictions were made less onerous, a greater amount of water could not be withdrawn without a new taking and a new assessment of damages therefor.

At the trial of a petition for assessment of damages sustained by a riparian owner on the Chicopee River from a taking of waters of the Swift River under St. 1927, c. 321, in connection with the construction and maintenance of the Quabbin Reservoir, evidence of the possible effect of the installation of an electric generator at the reservoir was inadmissible.

A report by the metropolitan district water supply commission under St. 1926, c. 375, § 1; St. 1927, c. 321, § 25; G. L. (Ter. Ed.) c. 30, § 32, setting forth in substance amounts claimed as damages by sundry riparian owners on the Chicopee River for takings of waters of the Ware and Swift rivers, estimates by engineers of the commission of damages sustained by such owners, and amounts paid to them by the Commonwealth, was not admissible at the trial of a petition for assessment of damages sustained by another riparian owner on the Chicopee River from a taking of waters of the Swift River.

Not all public documents are evidence of the truth of the matters that they contain.

No error appeared, at the trial of a petition by a landowner on a river for assessment of damages caused by a taking by the Commonwealth by eminent domain of waters of a tributary river, in the exclusion of deeds of other riparian owners on the same river granting a right to divert such waters to the Commonwealth for stated sums and in settlements of the grantors' claims, where the record did not disclose the ground of exclusion.

The judge, presiding at the trial of a petition for assessment of damages sustained by a riparian owner on the Chicopee River through the taking of waters of the Swift River under St. 1927, c. 321, in the exercise of sound discretion properly may admit evidence of sums received from the Commonwealth by other riparian owners on the Chicopee River in settlement of damages sustained through takings if it appears that the water rights taken from the petitioner are substantially similar to those taken from the other riparian owners save only in the extent of the rights taken, that the takings from them were not too remote in space and time from the taking in question, that the transactions between the Commonwealth and the other riparian owners amounted in reality to a purchase and sale of water rights and nothing more, irrespective of the form in which the transactions with them were clothed, and that the sales by the other riparian owners were voluntarily and freely made by them to the Commonwealth.

It was error to, exclude a document offered by a party in evidence after
he had produced it at the request of the opposing counsel and the
counsel had examined it.

Assessors' valuation of riparian real estate whose value was contended to
have been lessened by a taking under St. 1927, c. 321, of water from
a tributary river was properly admitted in evidence at the trial of a
petition by the riparian owner for assessment of damages.

At the trial of a petition for assessment of damages sustained by a taking
of waters of a river by eminent domain, testimony by a witness, war-
rantably found by the judge to be qualified as an expert, that persons
interested in water developing properties would not be willing to
invest unless it appeared that a profit of ten or fifteen per cent would
be yielded, was relevant.

PETITION, filed in the Superior Court on June 3, 1941.

The case was tried before *Broadhurst,* J.

*H. D. McLellan,* (*J. T. Noonan* & *H. V. Atherton* with
him,) for the petitioners.

*N. B. Bidwell,* Assistant Attorney General, & *F. H.
Wright,* for the Commonwealth.

RONAN, J.   This is a petition for the assessment of dam-
ages arising from the taking and diversion by the Com-
monwealth, acting through the metropolitan district water
supply commission in accordance with St. 1927, c. 321, of
certain waters of the Swift River in connection with the
construction and maintenance of the Quabbin Reservoir,
which also receives the waters diverted from the Ware
River under St. 1926, c. 375, and serves as an additional
supply of water for certain cities and towns situated out-
side the metropolitan water district.

The Chicopee River begins at the confluence of the Ware,
Swift and Quaboag rivers and discharges into the Connecti-
cut River, a navigable stream.   The petitioners are the
owners of land upon the Chicopee River at two different
locations.   They have a large tract of land on both sides of
the Chicopee River in Ludlow, having a frontage of a mile
and a half on the river, upon which were located a large
number of buildings for the manufacture and storage of
jute and hemp products, together with nearly five and one
half miles of railroad track, two locomotives and thirteen
box cars for transportation to and from these various build-
ings.   A hydroelectric power plant was also located upon

these premises. It consisted of a dam having an effective head of forty-one feet, a mill pond, and a power station in which were installed three units having a capacity of three thousand eight hundred seventy kilowatts. There was also space at this station for another water wheel and generator. Farther up the Chicopee River from Ludlow the petitioners owned several adjoining parcels of land at a place known as Red Bridge, where they also maintained a hydroelectric power plant. This plant consisted of a dam having a head of forty-eight feet, a mill pond, and a power house having two large water wheels and one small one. The power produced at this station at the time of the taking was thirty-eight hundred kilowatts, and it was transmitted from this station to the mill at Ludlow. The only damage claimed by the petitioners is due to the diversion of the water from the Swift River. Being dissatisfied with the amount of the verdict returned in their favor, they bring the case here on certain exceptions to rulings on evidence.

1. The Commonwealth was permitted to show that the petitioners' properties at Red Bridge and at Ludlow were damaged by the hurricane of September, 1938, upon the theory that the construction and operation of the Quabbin dam would either reduce or eliminate any future damage to these properties from floods. There was also evidence that this flood was the most severe ever recorded in the western part of the Commonwealth, and that it was not likely to occur again within the next two hundred fifty years. The unusual extent and violence of the flood and the consequential damage due to it have been mentioned in a number of decisions of this court in cases attributable to this hurricane. *Hoosac Tunnel & Wilmington Railroad* v. *New England Power Co.* 311 Mass. 667. *Krikorian* v. *Grafton Co-operative Bank,* 312 Mass. 272. *Murray* v. *Continental Ins. Co.* 313 Mass. 557.

Statute 1927, c. 321, § 4, provides that all proceedings in relation to takings of property or rights in property shall conform to the provisions of G. L. c. 79, except in certain particulars not now material. In the determination of damages under G. L. (Ter. Ed.) c. 79, § 12, where no

part of the land has been taken and where betterments are not assessed, the benefit accruing to the land on account of the taking is to be deducted, and this provision is applicable to the present case by virtue of G. L. (Ter. Ed.) c. 79, § 45, providing that no assessment of damages for the taking of or injury to land shall be made except under c. 79 or c. 80A, if betterments are to be assessed. As showing the legislative intent that this section shall be given the broadest possible scope, it is expressly provided that it is to be applied "notwithstanding any general or special act hitherto enacted" under which the takings might have been made. The section is an important part of c. 79, which was enacted not only for the purpose of establishing uniformity in the taking of land for a public purpose but also in order to secure uniformity in the assessment of damages. *Cole* v. *Boston,* 181 Mass. 374. *Walker* v. *Medford,* 272 Mass. 161. *Malinoski* v. *D. S. McGrath, Inc.* 283 Mass. 1, 8. *Wine* v. *Commonwealth,* 301 Mass. 451. We are of the opinion that in proceedings under St. 1927, c. 321, benefits are to be deducted from the damages arising from the diversion of the water in the same manner as in the ordinary taking of land for a public purpose under G. L. (Ter. Ed.) c. 79.

In order to be set off against the damages, a benefit must accrue directly to the land from the public improvement. It must be of peculiar and direct benefit to the land, giving to the land an advantage that it did not possess previous to the taking, and the increase in the market value of the land must be actual and real and one that may be presently estimated with a reasonable degree of certainty. *Meacham* v. *Fitchburg Railroad,* 4 Cush. 291. *Hilbourne* v. *County of Suffolk,* 120 Mass. 393. *Childs* v. *New Haven & Northampton Co.* 133 Mass. 253. *Fifty Associates* v. *Boston,* 201 Mass. 585. *Hall* v. *Commonwealth,* 235 Mass. 1. *Saltonstall* v. *New York Central Railroad,* 237 Mass. 391, 397. An advantage that is so remote and speculative that it might never result from the public improvement and so cannot add to the present value of the remaining land is not deductible from the damages. The governing principle is

well stated in *In re Petition of Rogers*, 243 Mich. 517, 525–526, in these words, "Such benefits, to be deducted, must be within the range of present view, capable of financial realization within a reasonable period, and not based upon speculative forecasts contingent upon something so uncertain that it is problematical if it will ever happen." This principle has been frequently followed in our own decisions and those of other jurisdictions. *Brown* v. *Providence, Warren & Bristol Railroad*, 5 Gray, 35. *Old Colony & Fall River Railroad* v. *County of Plymouth*, 14 Gray, 155. *Boston & Maine Railroad* v. *County of Middlesex*, 1 Allen, 324. *Bauman* v. *Ross*, 167 U. S. 548. *Union Electric Light & Power Co.* v. *Snyder Estate Co.* 65 Fed. (2d) 297. *Yolo Water & Power Co.* v. *Hudson*, 182 Cal. 48. *Washington Ice Co.* v. *Chicago*, 147 Ill. 327. *Glendenning* v. *Stahley*, 173 Ind. 674. *Western Newspaper Union* v. *Des Moines*, 157 Iowa, 685. *Broadway Coal Mining Co.* v. *Smith*, 136 Ky. 725. *Swenson* v. *Supervisors of Hallock*, 95 Minn. 161. *State* v. *Pope*, 228 Mo. App. 888. *Great Northern Railway* v. *State*, 102 Wash. 348.

There was no evidence that the petitioner's properties were so situated that they had been or were likely to be damaged by any of the floods which ordinarily occur or which might reasonably be expected to occur in that district. Upon this record, it cannot be reasonably anticipated that a flood approaching in intensity and violence that of September, 1938, will again visit the locus in either the immediate or the distant future. Whatever protection the Quabbin dam might afford against floods, it is plain that such protection was not needed by the petitioners' lands in the condition they were in at the time of the diversion of the waters of the Swift River, and, adequate provisions having been made against damage from floods, no further protection, even if available from the dam, would confer upon these lands a benefit they did not already have. The dam does not confer any special benefit upon these properties. In admitting the evidence that the petitioners' lands were damaged by the flood of September, 1938, on the ground that it could be found that the erection and maintenance

of the dam would prevent or lessen such damage in the future, we think there was error.

2. The order for taking, which was dated October 5, 1939, although the actual diversion was made on August 7, 1939, took all the waters of the Swift River, at a designated point of diversion, in excess of a flow of twenty million gallons a day. It further provided that no water was to be diverted when the flow was less than this amount and that there should be discharged from any storage created by the Commonwealth a sufficient amount of water to maintain, so far as said storage would allow, a flow of not less than twenty million gallons a day. The order also provided that "Any diversion made under this taking shall comply with such regulations and decisions as may from time to time be made with respect thereto by the Secretary of War acting under authority of the Acts of Congress of March 3, 1899, Chapter 425, Section 10, 30 Statutes at Large 1151." U. S. C. (1940 ed.) Title 33, § 403.

A riparian owner, as an incident to the ownership of the land, has the right to have the natural flow of a stream come to his land and to make such use of the water as will be reasonable with respect to similar rights of all other riparian owners. *Barrett* v. *Parsons*, 10 Cush. 367. *Pratt* v. *Lamson*, 2 Allen, 275. *Moulton* v. *Newburyport Water Co.* 137 Mass. 163. *Mason* v. *Whitney*, 193 Mass. 152. *Stratton* v. *Mount Hermon Boys' School*, 216 Mass. 83. *Isbell* v. *Greylock Mills*, 231 Mass. 233. A State, however, may change this rule and may authorize the appropriation of the flowing waters for such purposes as it may deem to be in the public interest, *United States* v. *Rio Grande Dam & Irrigation Co.* 174 U. S. 690, *Kansas* v. *Colorado*, 206 U. S. 46, *Pigeon River Improvement, Slide & Boom Co.* v. *Charles W. Cox, Ltd.* 291 U. S. 138, *Greeson* v. *Imperial Irrigation District*, 59 Fed. (2d) 529, *California-Oregon Power Co.* v. *Beaver Portland Cement Co.* 73 Fed. (2d) 555; but the power of the State is subordinate to that of the Federal government, which possesses plenary control over all navigable streams in the interest of interstate commerce and has full authority to control the flow in navigable streams and, for

the protection of these streams, to control the flow of their tributaries. *St. Anthony Falls Water Power Co.* v. *St. Paul Water Commissioners*, 168 U. S. 349. *Sanitary District of Chicago* v. *United States*, 266 U. S. 405. *United States* v. *West Virginia*, 295 U. S. 463. *United States* v. *Appalachian Electric Power Co.* 311 U. S. 377. Congress has exercised its authority to safeguard the navigability of the waterways of the country and has delegated to the Secretary of War the duties of enforcing this national policy, and the restrictions imposed by him relative to matters affecting the navigability of streams are binding upon the Commonwealth. See *Greenleaf Johnson Lumber Co.* v. *Garrison*, 237 U. S. 251; *Louisville Bridge Co.* v. *United States*, 242 U. S. 409, 417; *Sanitary District of Chicago* v. *United States*, 266 U. S. 405.

The nature of the restrictions imposed by the Secretary of War relative to the diversion of the waters of the Ware and Swift rivers has been well stated in *Connecticut* v. *Massachusetts*, 282 U. S. 660, 665, in these words: "After hearing both sides and examining the facts, the Secretary permitted diversion of the flood waters of the Ware in excess of 85 million gallons per day between October 15 and June 15 and prohibited the taking of any water except during that period. He permitted diversion of all waters of the Swift except enough to maintain a flow therein of 20 million gallons per day; but he required that, during the period from June 1 to November 30 there shall be released from the impounding dam 110 cubic feet per second (71 million gallons per day) whenever the flow of the Connecticut at Sunderland, Massachusetts (a town 20 miles north of the confluence of the Chicopee and Connecticut) is 4650 cubic feet per second or less, and 70 cubic feet per second (45 million gallons per day) when the flow is more than 4650 and less than 4900 cubic feet per second. The Secretary found that the discharge at Sunderland of 4650 cubic feet per second corresponds to an average gauge height at Hartford of two feet and that a discharge of 4900 cubic feet per second corresponds to 2.1 gauge height at Hartford." The binding effect of these restrictions upon the Common-

wealth is stated at page 674 in these words: "Massachusetts declares that she intends to and must obey these findings of the War Department." The validity of these restrictions of the War Department is beyond question. It was on the ground that the Commonwealth does not intend to withdraw any waters from the Ware and Swift rivers in excess of that authorized by St. 1926, c. 375, and St. 1927, c. 321, and as limited by these restrictions, that the injunction sought by Connecticut was denied.

The restrictions were incorporated in the order of taking and determined the extent of the taking and, this being the full measure of the amount of water that the Commonwealth could take, the jury had the right to determine what decrease in the market value of the premises of the petitioners resulted from the diversion of water to the amount and in the manner set forth in the order. There was no error in the admission in evidence of these restrictions in so far as they affected the taking of the waters of the Swift River. Their admission as to the withdrawal of water from the Ware River was not prejudicial error. *Noyes v. Gagnon*, 225 Mass. 580. *Flint Co. v. Dana*, 246 Mass. 577. *Waxman v. Cohen*, 253 Mass. 548. *Glass v. Metropolitan Life Ins. Co.* 258 Mass. 127. *Stegemann v. Kelley*, 267 Mass. 450.

If these restrictions have not been enforced by the Federal government, as the petitioners contend, that does not prove that they have been abandoned or are no longer in effect. Their nonenforcement does not destroy their validity, and they continue to have the same force and effect as if strictly enforced. The Commonwealth remains bound by them until they are repealed or rescinded, and must permit the flow of water in the Swift River in the quantity required by these restrictions. *Wellington, petitioner*, 16 Pick. 87, 102. *Commonwealth v. Davis*, 140 Mass. 485. *Painless Parker v. Dental Examiners*, 216 Cal. 285. *State v. Burr*, 79 Fla. 290. *Shutt v. State*, 173 Ind. 689. *Pearson v. International Distillery*, 72 Iowa, 348. *Snowden v. Snowden*, 1 Bland, 550. *State v. Mellor*, 140 Md. 364. *Naughton v. Boyle*, 129 Misc. (N. Y.) 867. *Homer & Son v. Common-*

*wealth,* 106 Pa. 221. *Lee* v. *Seitz,* 13 Tenn. App. 260. See *Gately* v. *Taylor,* 211 Mass. 60; *Morley* v. *Police Commissioner of Boston,* 261 Mass. 269; *Nelson* v. *Economy Grocery Stores Corp.* 305 Mass. 383.

The compensation to which the petitioners are entitled is based upon the exercise by the Commonwealth of the right to take the waters of the Swift River to the full extent authorized by the order of taking and in conformity with the restrictions of the War Department then in effect and incorporated in the order. If the restrictions are subsequently made more onerous and require the Commonwealth to permit a greater amount of water to flow in the Swift River with a consequential benefit to the petitioners, the amount of compensation to which the petitioners were entitled under the taking of October 5, 1939, would not be diminished by such a change, *Ipswich Mills* v. *County Commissioners of Essex,* 108 Mass. 363, *Bailey* v. *Woburn,* 126 Mass. 416, *Howe* v. *Weymouth,* 148 Mass. 605, *Imbescheid* v. *Old Colony Railroad,* 171 Mass. 209, *Rockport* v. *Webster,* 174 Mass. 385, 392, *Turner* v. *Gardner,* 216 Mass. 65, 69; on the other hand, if the restrictions are removed or altered so that the Commonwealth in so far as the restrictions are concerned might retain more water, then such additional amount cannot be withdrawn, unless a new taking is made and additional compensation paid to the petitioners. Each successive taking must be paid for. See *Broderick* v. *Department of Mental Diseases,* 263 Mass. 124. The effect of the restrictions on the flow of water in the Swift River could properly be shown in evidence.

3. The respondent's counsel in the cross-examination of a witness started to introduce evidence that there is equipment or construction at the Quabbin dam designed to house an electrical generator and, upon objection by the petitioners, the judge stated that he thought it had been agreed at the view that there was such construction and then withdrew this statement, telling the jury that apparently the petitioners had not so agreed. The witness then was permitted to answer that he was aware that a foundation had been laid for the purpose of installing a hydroelectric turbine

generator. Upon inquiry by the judge, counsel stated that he proposed to show that the operation of this generator would quadruple the flow of the Swift River, and thereupon the judge stated that he would not presently admit the evidence as he desired further time to consider its admissibility. No further reference thereafter was made to the matter. We need not consider for the purposes of this case the competency of evidence to prove the Commonwealth's contention or go a step farther back and determine whether such a contention was sound, because the judge made no ruling. As the question might arise at the next trial, we pause to point out that the inadmissibility of the evidence is settled by *Old Colony Railroad* v. *Miller*, 125 Mass. 1, *Howe* v. *Weymouth*, 148 Mass. 605, *Proprietors of Mills* v. *Randolph*, 157 Mass. 345, *Newton* v. *Perry*, 163 Mass. 319, *Stevens* v. *Worcester*, 196 Mass. 45, *Flagg* v. *Concord*, 222 Mass. 569, 572, and *Barnes* v. *Peck*, 283 Mass. 618, 628.

4. The petitioners excepted to the exclusion of certified copies of seven deeds running to the Commonwealth from owners of certain parcels of land located upon the Chicopee River, upon each of which a system of water power had been developed and used in connection with an industrial plant situated upon the premises or for the generation of power for sale. These deeds were executed during the period from November 24, 1931, to August 20, 1934. Each of them recited that the Commonwealth had taken on March 6, 1931, certain waters of the Ware River in accordance with St. 1926, c. 375, and that the Commonwealth was authorized and intended to take certain waters of the Swift River by virtue of St. 1927, c. 321; that the grantor was the owner of certain premises bordering on the Chicopee River and water rights therein; and that it was the intention of the grantor to release all its right and interest in the waters which the Commonwealth was authorized to take from the Ware and Swift rivers and to arrive at a settlement in full for all claims for damages present and future on account of the diversion of water from both these rivers. The grantors for a consideration

named granted and released all such rights to the Commonwealth and forever discharged the Commonwealth from all damages arising out of said takings. The respondent's objection is not based upon the fact that copies instead of the original deeds were offered. Neither is there any contention that any land was taken from any of the grantors or that anything was taken or expected to be taken except certain waters of both rivers which of course would result in a diminution of the waters of the Chicopee River. It had already appeared that the Chicopee River was seventeen and one half miles in length and that it had a total fall of two hundred forty-nine feet. The various water power sites had been described, together with the total fall or head of water connected with each site. There was evidence that the diversion of the waters of the Ware River was twelve and one half per cent of the quantity withdrawn from the Swift River. These deeds were executed prior to the diversion of the waters of the Swift River, and the damages resulting to these seven riparian owners were merely estimates of the actual damages that would be caused by the withdrawal of these waters. The petitioners contend that, if the amounts stated in the deeds as paid by the Commonwealth were compared with the head or fall of water located upon the respective sites of these owners, it would appear that these damages were based upon and paid for at the rate of approximately $10,000 for each foot of head for the diversion of the waters of the Swift River. And for the purpose of showing that there was no compulsion exerted upon the grantors, the petitioners offered to introduce in evidence a table contained in the annual report of the metropolitan district water supply commission for the year ending November 30, 1937, which showed the amounts claimed as damages by each of these grantors, the estimates of the engineers of the commission of the damages sustained by each of them, and the amounts paid by the Commonwealth. This table disclosed that in one instance the amount paid was $1,500 more and in another $5,000 more than the amount estimated by the engineers; that in a third instance the amount claimed by the owner, the

amount estimated and the amount paid were the same; and that in the remaining four instances the amounts paid were less by $237,500 than the total amounts demanded by the owners. Under the heading of remarks on this table was the following: "Settlement made by office of Attorney General after jury was impaneled, includes purchase by Commonwealth of real estate and water rights."

We first consider the admissibility of this table. Statute 1926, c. 375, which established the commission and defined its powers and duties, which were chiefly concerned with securing a supply of water from the Ware River, required the commission by § 1 to make an annual report, in conformity with G. L. c. 30, § 32, providing for the preparation of annual reports by certain State officers and departments, which, "except for facts or information specifically required by law, shall be a brief summary of the said year's work." See now G. L. (Ter. Ed.) c. 30, § 32, as appearing in St. 1945, c. 292, § 4. These reports were to be printed as public documents at public expense and distributed in accordance with G. L. c. 5, §§ 6, 7. We assume in favor of the petitioners that the duty of the commission to prepare such reports with reference to the Swift River was imposed upon the commission by St. 1927, c. 321, § 25.

The report in question was a public document, but it did not thereby become admissible evidence of the truth of its contents. Public documents are public records within G. L. (Ter. Ed.) c. 4, § 7, Twenty-sixth, but that definition exists for the purpose of construing "public records" as those words appear in the statutes and was not intended to make any changes in the rules of evidence. The publication of the details of settlement made with those whose properties were taken by eminent domain was not "specifically required by law," and whether they should be included in a report was optional with the commission. Their inclusion in the report did not give them evidentiary value. Not all documents which have been prepared by a public official and filed in a public office and which therefore are in a sense public documents are evidence of the truth of the matters that they contain. The statute, G. L. (Ter. Ed.)

c. 30, § 32, does not manifest any intent that the report as to the matter in question should be primary evidence of the facts reported. *Allen* v. *Kidd*, 197 Mass. 256. *P. Garvan, Inc.* v. *New York Central & Hudson River Railroad*, 210 Mass. 275. *Jewett* v. *Boston Elevated Railway*, 219 Mass. 528. *Commonwealth* v. *Slavski*, 245 Mass. 405, 415–417. See *Sanford* v. *Boston Herald-Traveler Corp.* 318 Mass. 156. Compare *Worcester* v. *Northborough*, 140 Mass. 397. There was no error in the exclusion of this table which purported to be a summary of the settlements made with the grantors in the various deeds.

The judge also excluded the deeds. We do not know upon what ground that ruling was made. During the argument on the admissibility of that evidence the judge mentioned that the deeds might represent settlements of damages made with the grantors. It is to be noted that the grantors were described as owners of certain defined parcels of land on the Chicopee River together with water rights on the river. It was further stated that they intended to arrive at a settlement in full for any and all claims for damages that they might have because of the diversion of water and that for the consideration named they released all claims "for damages to the aforesaid property in said Chicopee." He might have come to the conclusion, from an inspection of the deeds and the table in the annual report which was offered with the deeds, that they did not furnish a standard for the evaluation of water rights alone. The deeds included a release to the Commonwealth of all claims and all rights of action, past, present and future, for damages to the real estate arising from "the carrying out" of the provisions of St. 1926, c. 375, and St. 1927, c. 321. We cannot say that, in view of the character of the proffered evidence, he was wrong. *Cobb* v. *Boston*, 112 Mass. 181, 183–184. *Donovan* v. *Springfield*, 125 Mass. 371. *Sawyer* v. *Boston*, 144 Mass. 470. *Henry J. Perkins Co.* v. *Springfield*, 248 Mass. 447.

5. As there must be a new trial of this case by reason of sustaining exceptions already discussed, it is proper to discuss the questions that are likely to be presented with

reference to the payments made by the Commonwealth to these other riparian owners and whether these payments may properly be shown as evidence of the value of the petitioners' water rights which were taken by the Commonwealth. It is to be noted that the petitioners are not seeking damages strictly for the loss of water rights as such, but are seeking damages for the diminution in the market value of their lands resulting from the diversion of the waters of the Swift River. It is true that the damage to their premises was caused by the lessening of the flow of water, but the ultimate question remains the same, namely, the decrease, if any, in the market value of the land due to the diminution of the flow. *Boston Belting Co.* v. *Boston,* 152 Mass. 307. *Fosgate* v. *Hudson,* 178 Mass. 225. *Lynnfield* v. *Peabody,* 219 Mass. 322. *Westport* v. *County Commissioners of Bristol,* 246 Mass. 556. Water power or water rights are considered as a part of the land in evaluating the land because the market value of land upon the bank of a river is generally increased by appurtenant water power which makes the land adaptable to various valuable uses. *Fall River* v. *County Commissioners of Bristol,* 125 Mass. 567. *Lowell* v. *County Commissioners of Middlesex,* 152 Mass. 372. *Boston Belting Co.* v. *Boston,* 183 Mass. 254. *Lakeside Manuf. Co.* v. *Worcester,* 186 Mass. 552. Water rights as shown by the evidence in the instant case and by our own decisions are sometimes the subject of sale to those whose lands are so located that such rights can be allocated to them. If it can be said that water rights may have a market value, considered apart from land, their market must necessarily be limited to a comparatively small area in which the rights may be made available. *Lowell* v. *County Commissioners of Middlesex,* 146 Mass. 403, 413. *Blackstone Manuf. Co.* v. *Blackstone,* 200 Mass. 82. *Essex Co.* v. *Lawrence,* 214 Mass. 79. *Crocker-McElwain Co.* v. *Assessors of Holyoke,* 296 Mass. 338. But even if the value of water rights is considered apart from the value of the land, it does not necessarily follow that a uniform value of a certain amount for each foot of head lost would be fair even in a case where the diversion of the water impaired

the water rights of the different riparian owners to the same extent, because one having a small amount of water power might suffer more from the diversion than one having a large amount of power and the value of the rights taken from the former might be greater than the value of the same quantity of rights taken from the latter. Furthermore, sales of water rights are not likely to occur as frequently as sales of other property in the ordinary course of business. See *Benham* v. *Dunbar*, 103 Mass. 365, 369.

If it is made to appear that the water rights taken from the petitioners are substantially similar to those taken from the other riparian owners, save only in the extent of the rights taken, and that the taking from them was not too far distant in space and time from the taking in question, then it is to be reasonably expected that the judge in the exercise of a sound discretion will find that the value of those rights will furnish a fair standard of the value of the petitioners' rights, provided it is shown by those having knowledge of the details involved, including the basis upon which the payments were in fact computed, that the transactions between the Commonwealth and these other riparian owners amounted in reality to a purchase and sale of water rights and nothing more, irrespective of the form in which these transactions were clothed and, finally, provided it is shown that these sales were voluntarily and freely made between these riparian owners and the Commonwealth.

The general rule governing the admission in evidence of the sales of land similar to the land in controversy is well settled in this jurisdiction, *Patch* v. *Boston*, 146 Mass. 52; *Lyman* v. *Boston*, 164 Mass. 99; *Fourth National Bank* v. *Commonwealth*, 212 Mass. 66; *McCabe* v. *Chelsea*, 265 Mass. 494; *Iris* v. *Hingham*, 303 Mass. 401, although its application is not always easy due to the fact that there is such a wide range of differences between various properties that it becomes the duty of the judge in the exercise of sound discretion to determine whether the degree of similarity is so high that the sales of other properties will furnish a practical aid in determining the market value of the property in issue, *Shattuck* v. *Stoneham Branch Railroad*, 6 Allen,

115; *Burley* v. *Old Colony Railroad*, 219 Mass. 483; *James Millar Co.* v. *Commonwealth*, 251 Mass. 457, 464; *Wright* v. *Commonwealth*, 286 Mass. 371, and an exercise of his discretion should rarely be reversed. *Paine* v. *Boston*, 4 Allen, 168. *Chandler* v. *Jamaica Pond Aqueduct Corp.* 122 Mass. 305. *Woonsocket Machine & Press Co.* v. *New York, New Haven & Hartford Railroad*, 239 Mass. 211.

The sales of similar properties, however, cannot furnish evidence of the value of the property taken, unless the sales of these properties were made in such circumstances as to show their fair market value. The factors that influenced one to sell and the other to buy vary within a wide compass and may be open to investigation and explanation. *Manning* v. *Lowell*, 173 Mass. 100. *Lawrence* v. *O'Neill*, 317 Mass. 393, 397–398. A sale produced by compulsion exerted on the seller by the buyer is not a standard of fair market value. A sale to one having the power either to purchase or to take by eminent domain is not for that reason alone to be excluded. Our decisions uniformly hold that a sale not freely and voluntarily made must be rejected as evidence of market value, but some cases seem to indicate that a sale to the party having the power to condemn is as matter of law not free from compulsion. See *Cobb* v. *Boston*, 112 Mass. 181; *Sawyer* v. *Boston*, 144 Mass. 470; *Providence & Worcester Railroad* v. *Worcester*, 155 Mass. 35; *Henry J. Perkins Co.* v. *Springfield*, 248 Mass. 447. To rule that all such sales are not free from compulsion rests upon an assumption that is not warranted. Payments to these riparian owners preceded by from five to nearly eight years the actual diversion of water from the Swift River. Doubtless, a sale to a party possessing the power of eminent domain must be scrutinized more closely than one to a party not possessing that power, but if found to be free and voluntary there is no reason why it should be treated differently from one made to such a party. The burden of proving that the sales of these other properties were voluntary transactions is upon the petitioners. It was said in *Epstein* v. *Boston Housing Authority*, 317 Mass. 297, 301, "We think that there is a presumption, in the technical and

proper meaning of that word, that the price of land sold was fixed freely and not under compulsion." It was also pointed out that we would not follow the implication contained in certain land damage cases tending to deny the existence of freedom from compulsion in sales to one having power to take the property. It was said in *Wyman* v. *Lexington & West Cambridge Railroad*, 13 Met. 316, 326, relative to the price paid by the defendant for an adjacent lot, that "This was evidence of a fact, and not of an opinion. The price for which other adjacent lots had been actually sold was admissible, open of course to any evidence explanatory of the circumstances attending such sale, and tending to show why the purchasers gave a price greater than the true value of the land. If it had been a price fixed by a jury, or in any way compulsorily paid by the party, the evidence of such payment would be inadmissible before the jury. Upon the principle on which we should admit evidence of other sales between other parties of adjacent lots, this evidence was admissible, and none the less so because the railroad corporation were themselves the purchasers." It was remarked in *O'Malley* v. *Commonwealth*, 182 Mass. 196, 198, that "We cannot say merely because of the name of the purchaser that the sale was not a fair transaction in the market rather than a compulsory settlement. The board has power to purchase as well as to condemn land." In *Newburyport Water Co.* v. *Newburyport*, 168 Mass. 541, it was held that evidence of what the city paid a third person for his spring was admissible because it did not appear that his acceptance of this price was compulsory. We think these cases rest upon sound reason and upon common experience and find support in the decisions of other jurisdictions. *Washington Home for Incurables* v. *Hazen*, 70 Fed. (2d) 847. *Eames* v. *Southern New Hampshire Hydro-Electric Corp.* 85 N. H. 379. *Ross* v. *Commissioners of the Palisades Interstate Park*, 90 N. J. L. 461. *Langdon* v. *Mayor, Aldermen & Commonalty of New York*, 133 N. Y. 628. *Charleston & Western Carolina Railway* v. *Spartanburg Bonded Warehouse, Inc.* 151 S. C. 542. *Seaboard Air Line Railway* v. *Chamblin*, 108 Va. 42. *Mononga-*

hela West Penn Public Service Co. v. Monongahela Development Co. 101 W. Va. 165.

6. In response to a request by the respondent's counsel, the petitioners produced a lease to the Ludlow Manufacturing & Sales Co. of a portion of their premises together with an accompanying plan, both of which were examined by the respondent's counsel. The petitioners then offered the lease and plan in evidence. They should have been admitted. *Leonard* v. *Taylor*, 315 Mass. 580. As there must be a new trial, we need not decide whether their exclusion constituted reversible error. The income received from the use and occupation of land is evidence of its market value, *Lincoln* v. *Commonwealth*, 164 Mass. 368, 380, *Levenson* v. *Boston Elevated Railway*, 191 Mass. 75, 77, *Crocker-McElwain Co.* v. *Assessors of Holyoke*, 296 Mass. 338, 346, *Ryder* v. *Lexington*, 303 Mass. 281, 292; but income derived from a business conducted upon the premises depends on various factors not attributable to the land and furnishes no criterion for the determination of the market value of the land. *Bailey* v. *Boston & Providence Railroad*, 182 Mass. 537. *Brackett* v. *Commonwealth*, 223 Mass. 119, 126. *Powers* v. *Rittenberg*, 270 Mass. 221, 224. *Revere* v. *Revere Construction Co.* 285 Mass. 243. *Assessors of Quincy* v. *Boston Consolidated Gas Co.* 309 Mass. 60, 64. The compensation to be paid by the lessee included compensation for matters other than the use and occupation of the demised premises, but it may be that the portion paid for such use and occupancy could be segregated if the lease had been admitted in evidence and the petitioners had been permitted to introduce oral evidence of what was contained in a written statement which was submitted as an offer of proof.

7. There was no error in the admission of the assessors' valuation. Such evidence was competent by virtue of G. L. (Ter. Ed.) c. 79, § 35; and applied to the instant proceedings by virtue of § 45 of said chapter and by § 4 of c. 321 of St. 1927. The applicability of c. 79 to proceedings under St. 1927, c. 321, has already been discussed in this opinion in dealing with the right to set off benefits against damages under § 12 of c. 79.

8. There was no error in admitting the testimony of one Shaw that persons interested in water developing properties would not be willing to invest unless it appeared that a profit of ten or fifteen per cent would be yielded. He showed sufficient familiarity with the subject, and his testimony was relevant to the value of water rights. Although the evidence of the respondent's two expert witnesses as to the market value of the petitioners' properties was somewhat meager with respect to their qualifications and knowledge concerning water rights, it appeared that they had considerable and wide experience in dealing with various types of industrial properties, some of which were reasonably near the lands of the petitioners, and that they had previously testified in the Superior Court in cases involving the diversion of waters from the Ware and Swift rivers, and we cannot say the judge was wrong in permitting them to express their opinion as to the market value of the land. *Warren* v. *Spencer Water Co.* 143 Mass. 155. *Cochrane* v. *Commonwealth*, 175 Mass. 299. *Johnson* v. *Lowell*, 240 Mass. 546. *James Millar Co.* v. *Commonwealth*, 251 Mass. 457. *Vineyard Grove Co.* v. *Oak Bluffs*, 265 Mass. 270. *Goodyear Park Co.* v. *Holyoke*, 298 Mass. 510. Compare *Lakeside Manuf. Co.* v. *Worcester*, 186 Mass. 552; *Maher* v. *Commonwealth*, 291 Mass. 343.

*Exceptions sustained.*